INSURANCE COMPANY OF NORTH AMERICA & another *vs.*
COMMISSIONER OF INSURANCE
(and a companion case between the same parties).

Suffolk.    March 6, 1956. — May 4, 1956.

Present: QUA, C.J., RONAN, WILKINS, COUNIHAN, & WHITTEMORE, JJ.

*Insurance,* Inland marine insurance.

G. L. (Ter. Ed.) c. 175, § 47, Second (c), does not authorize the writing
of inland marine insurance providing to dealers in certain goods not
enumerated in (d) of cl. Second "all risk" coverage not only during
actual transportation to and from their premises but continuously
from the inception to the termination of their interests in the goods.

APPEAL, filed in the Supreme Judicial Court for the
county of Suffolk on June 30, 1955, from an order of the
commissioner of insurance.

BILL IN EQUITY, filed in that court on June 30, 1955.

The cases were reserved and reported by *Wilkins, J.,*
without decision.

*W. Perry Epes* of Virginia and New York, (*George A.
Brown & Thomas M. Joyce* with him,) for the plaintiffs.

*Edward F. Mahony,* Assistant Attorney General, for the
defendant.

WILKINS, J.   Insurance Company of North America and
its wholly owned subsidiary, Philadelphia Fire and Marine
Insurance Company, are Pennsylvania corporations licensed
to write inland marine insurance in this Commonwealth.
G. L. (Ter. Ed.) c. 175, § 47, Second.   The commissioner
of insurance has made an order that these companies (here-
inafter called North America) cannot issue policies insuring
certain dealers against all risks.   The first case is an appeal
from that order, purportedly under G. L. (Ter. Ed.) c.
174A, § 18 (c), inserted by St. 1947, c. 614, § 1, as amended
by St. 1954, c. 681, § 17.   The second case is a bill for a

declaratory decree as to the validity of such policies and as to the powers of the commissioner. G. L. (Ter. Ed.) c. 231A, inserted by St. 1945, c. 582, § 1. The single justice reserved and reported each case without decision upon the pleadings and the record, including a report of the evidence of the proceedings before the commissioner. G. L. (Ter. Ed.) c. 211, § 6; c. 231, § 111.

The cases present similar issues. As the result will not be affected, and as no contention has been made to the contrary, we shall assume, without deciding, that the appeal lies in the first case. In the second case, an interlocutory decree is to be entered overruling the demurrer to the bill of complaint, and we shall proceed directly to the merits.

Inland marine insurance is comparatively new. It is an outgrowth of the development of land transportation. The Federal operation of railroads in the overcrowded conditions of World War I, the inauguration of shipment by motor truck and by airplane, greater mobility of population, and increased traffic in personal property were some of the factors accelerating the need for a type of insurance policy which would cover portable personal property other than at fixed locations. The name itself is a misnomer, and includes many forms of insurance wholly lacking in marine features. While the chief characteristic is a relation to transportation, there are recognized categories which have no such relation. The competition of those in the new field of inland marine insurance led to much controversy with those in the established fields of fire and casualty insurance. Appleman, Inland Marine Insurance, 1–12. Rodda, Inland Marine & Transportation Insurance, 34–48.

Certain facts are admitted in the pleadings. Others appear in the deputy commissioner's opinion and decision. On November 15, 1954, a Boston agent for North America's inland marine department notified producers in this Commonwealth that North America was prepared to issue all risk policies for wholesale or retail dealers in cameras, furs, heating and air conditioning equipment, household appliances, industrial machinery and tools, marine supplies, musi-

cal instruments, office equipment and supplies, professional and scientific instruments, and sporting goods. These policies were to "provide coverage to the insured's merchandise on incoming shipments and [the said coverage] continues while at the insured's premises and during delivery to customers and installation at customer's premises, said coverage commencing when the insured's interest commences and ceasing when the insured's interest ceases."

By letter dated December 7, 1954, the deputy commissioner of insurance notified North America that with the exception of the policies for camera, fur, and musical instrument dealers the property of the dealers enumerated above could not be insured under an inland marine policy. The letter further stated, "By ruling effective October 1, 1953, this department promulgated the Nation-wide Marine Definition as interpretative of the insuring powers of companies authorized to write inland marine insurance in this Commonwealth. This ruling authorizes inland marine insurance coverage for the property of the dealers specifically named in the definition. It is not intended and the definition shall not be construed to include within its scope other dealers not so named." This ruling was made pursuant to G. L. (Ter. Ed.) c. 174A, § 4, inserted by St. 1947, c. 614, § 1. Chapter 174A is known as the fire, marine, and inland marine rate regulatory law. Section 4, in part, says: "This chapter shall apply to risks . . . insured by insurance companies authorized to transact business . . . under the first, second or third clauses of section forty-seven of chapter one hundred and seventy-five. Inland marine insurance shall be deemed to include insurance now or hereafter defined by law, or by interpretation thereof, or, if not so defined or interpreted, by ruling of the commissioner, or as established by general custom of the business, as inland marine insurance."

Insurance companies may be incorporated, under G. L. (Ter. Ed.) c. 175, § 47, "Second, To insure . . . (b) against risks of inland navigation and transportation; (c) in connection with marine or inland navigation or transportation in-

surance on any property, against any risk or hazard whether to person or to property, including legal liability on account of loss or damage to either, arising out of the construction, repair, operation, maintenance or use of the subject matter of such primary insurance." Clause Second, (d), on which North America expressly does not rely, authorizes, as part of inland marine insurance, floater policies for dealers in specified goods not in transit "in precious stones, jewels, jewelry, gold, silver or other precious metals, silverware, musical instruments, furs, fur garments or fine arts," irrespective of any element of transportation.

The Nation-wide Marine Definition was adopted by the national association of insurance commissioners in June, 1953, and recommended for acceptance and promulgation by the States. This definition was twice amended by the commissioner. The national association of insurance commissioners has a membership composed of the official who by law is the responsible head of the business of insurance in his State. The purposes of the association are to promote uniformity in legislation affecting insurance; to encourage uniformity in rulings under the several State insurance laws; to disseminate information to State insurance officials; and to establish ways and means to protect policyholders in the United States.

In June, 1933, the national convention of insurance commissioners adopted a "Nation-wide Definition and Interpretation of the Insuring Powers of Marine and Transportation and Underwriters." The department of insurance, effective January 15, 1934, adopted, "as a working arrangement," that definition. The Nation-wide Marine Definition, approved by the national convention of insurance commissioners and promulgated by the department on October 1, 1953, was the result of a reëxamination by the committee of the earlier definition in the light of intervening experience.

On December 16, 1954, North America formally requested a hearing by the deputy commissioner on the question whether the property of dealers listed in his letter of December 7, 1954, may be insured under inland marine insurance.

On January 18, 1955, the hearing was held before the deputy commissioner who on March 7, 1955, rendered a decision affirming the order contained in his letter of December 7, 1954. On March 9, 1955, North America appealed to the commissioner, who, on May 20, 1955, rendered his decision and order, affirming the decision and order of the deputy commissioner. G. L. (Ter. Ed) c. 26, § 7; c. 174A, § 18 (a), inserted by St. 1947, c. 614, § 1.

Foreign corporations, such as North America, "cannot engage in any business here the transaction of which is not permitted by the laws of this Commonwealth. G. L. (Ter. Ed.) c. 181, § 2. See G. L. (Ter. Ed.) c. 175, § 5, as amended by St. 1933, c. 107, § 2. On the other hand they may, so far as at present material, conduct any business which a domestic company may conduct and which is permitted by the law of the State of their incorporation." *Insurance Co. of North America* v. *Commissioner of Insurance*, 327 Mass. 745, 756. G. L. (Ter. Ed.) c. 175, § 150, as appearing in St. 1945, c. 609, § 2, as amended by St. 1946, c. 250. By G. L. (Ter. Ed.) c. 175, § 3, no corporation whether foreign or domestic, "shall make a contract of insurance upon or relative to any property or interests or lives in the commonwealth, or with any resident thereof, and no person shall negotiate, solicit, or in any manner aid in the transaction of such insurance" except as authorized in cc. 175, 176, or 178, "or except as otherwise expressly authorized by law." See *Stone* v. *Old Colony Street Railway*, 212 Mass. 459, 462.

North America's first contention is that it has an absolute right to issue all risk policies for dealers in heating and air conditioning equipment, household appliances, industrial machinery and tools, marine supplies, office equipment and supplies, professional and scientific instruments, and sporting goods. The assertion is made that inland marine insurance upon these items is authorized by G. L. (Ter. Ed.) c. 175, § 47, Second, (c).

Pertinent here are excerpts from North America's brief. "The dealers policies in issue would provide broad, con-

tinuous, 'all risk' coverage without gaps from the time the dealer buys his goods until he sells them, all in a single policy." "All of these ten dealers policies [including dealers in cameras, furs, and musical instruments] cover the dealer's merchandise in the course of transportation to his premises, while on the premises, and during transportation to customers and installation at customer's premises. The coverage commences when the dealer's property interest commences and continues as long as he has such an interest, and includes similar property of others in his custody, as for repair or on consignment. It extends to shipments for exhibition, demonstration, approval or trial as well as for sale. It likewise covers the dealers' merchandise while under instalment sale." The seven policies in controversy purport to cover property within the continental United States (excluding Alaska) and Canada, and only the policy for marine supply dealers excludes "Property sold under an instalment sales plan after delivery to the customer." The other six policies provide, "Unless indicated to the contrary on Page DE 1, the following coverage is granted: Property insured under this policy which has been sold under an instalment sales or deferred payment plan [or leased from the assured] until the financial interest of the assured has ceased." The words in brackets are added in the forms for industrial machinery and tool dealers and for office machinery and supply dealers.

Policies with these provisions, it is argued, fall within c. 175, § 47, Second, (c), because they afford insurance "in connection with marine or inland navigation or transportation insurance" and "arising out of the construction, repair, operation, maintenance or use of the subject matter of such primary insurance." Obviously, much more may be involved than transportation risks on deliveries to and from the dealer's premises. We do not perceive any limit to the coverage of a dealer's entire stock in trade for as long as the policy or its renewals may continue. Merchandise could be covered which had long been in stock. On instal-

ment sales the duration of coverage could extend for months or even years after transportation had ceased.

We cannot discover that there necessarily will be the continuous movement of goods which North America contemplates in its brief, where it is said: "During the normal operation of all of these dealers the course of business calls for the continuous movement of the goods from the manufacturer or distributor to the dealer's store, and from the store to the purchaser, the goods remaining at the store only long enough for a purchaser to be found. It is never intended that the goods have more than a temporary stop at the store in connection with their normal movement from factory to consumer. The very business of these dealers depends upon this continuous movement." The places where there will not necessarily be movement are at the store subject to sale and at the location where the article remains in the possession of the conditional buyer while the dealer holds title as unpaid seller.

The history of inland marine insurance, to which we have briefly alluded, and the legislative development of c. 175, § 47, support the commissioner's order. By St. 1872, c. 375, § 1, incorporation was authorized "for the purpose of transacting the business of insurance . . . against loss or damage by fire, by lightning, by tempest, or by the perils of the sea, and other perils usually insured against by marine insurance companies, including risks of inland navigation and transportation . . . ." By St. 1887, c. 214, § 29, the purposes for which insurance companies might be formed were segregated and clause "Second" made its first appearance: "Second, To insure . . . vessels, freights, goods, money, effects, and money lent on bottomry or respondentia, against the perils of the sea and other perils usually insured against by marine insurance including risks of inland navigation or transportation." The language assumed substantially its present form in St. 1921, c. 198: "Second, To insure . . . against the perils of the sea and other perils usually insured against by marine insurance; risks of inland navigation and transportation; also, in con-

nection with marine or inland marine or transportation insurance on property, to insure against any risk whether to person or to property, including liability for loss or damage to either, arising out of the construction, repair, operation, maintenance or use of the subject matter of such primary insurance . . . ." Thus far the element of transportation dominated our statutes on inland marine insurance. The provisions now in (d) respecting jewelry dealers were added by St. 1927, c. 53, § 1, entitled, "An Act providing for jewelers' block insurance." Subdivision (d) took its present form in St. 1931, c. 109, entitled, "An Act permitting certain insurance companies to insure certain personal property against all risks or hazards."

It is undisputed that G. L. (Ter. Ed.) c. 175, § 47, Second, (d), does not authorize the issue of policies on the goods of those dealers which are the subject of the present complaint. By "permitting certain insurance companies to insure certain personal property against all risks" the Legislature did not authorize the insurance of other property against all risks. If the articles enumerated in (d) were subject to inland marine insurance under (c), no reason for separate legislation appears. The conclusion is manifest, that (c) is still related to the element of transportation and (d) exists without regard to that element.

The order of the commissioner is attacked as discriminatory. Alleged inconsistencies are cited between this and other rulings of his respecting dealers in other commodities. These charges assume the very point at issue, which is the scope of inland marine insurance. Policies authorized under c. 175, § 47, Second, (d), such as to dealers in jewelry, musical instruments, or furs, where no element of transportation is involved, are not in point. The Legislature could recognize that those items are "by general custom of the business" within the field of inland marine insurance. The inclusion of some articles within this field cannot be reconciled logically with the exclusion of others. The truth of the matter undoubtedly is that inland marine insurance is a hybrid which has just grown. This circum-

stance, however, does not deprive the Legislature, or the department when properly authorized by the Legislature, of the power to determine enlargements of its coverage.

The primary purpose of the insurance determines its character. *Vermes Credit Jewelry, Inc.* v. *Fireman's Fund Ins. Co.* 92 Fed. Sup. 905, 908 (D. C. Minn.), affirmed sub nomine *Fireman's Fund Ins. Co.* v. *Vermes Credit Jewelry, Inc.* 185 Fed. (2d) 142, 144–145 (C. A. 8). *Davis Yarn Co. Inc.* v. *Brooklyn Yarn Dye Co. Inc.* 293 N. Y. 236, 247–248. We are unable to hold that the primary purpose of the policies in controversy is related to transportation. We do not accept North America's contention based upon an absolute authorization conferred by c. 175, § 47, Second, (c).

As valid ground exists under G. L. (Ter. Ed.) c. 175, § 47, Second, for the commissioner's order, we shall not discuss questions argued respecting G. L. (Ter. Ed.) c. 174A, § 4, inserted by St. 1947, c. 614, § 1. No controversy remains which we feel bound to consider. This includes the Nation-wide Marine Definition. We think it appropriate to add a brief statement as to the question whether the commissioner is authorized by c. 174A, § 4, or in fact has undertaken, to limit statutory underwriting powers conferred by c. 175, § 47, Second. If there be such admissions in the answers of the Attorney General (compare *Bancroft* v. *Cook*, 264 Mass. 343, 348; *Markus* v. *Boston Edison Co.* 317 Mass. 1, 7; *Zaleski* v. *Zaleski*, 330 Mass. 132, 134–135), they would not be binding upon this court in performing its duty to make a declaratory decree.

In the first case (No. 5516), the order of the commissioner is affirmed.

In the second case (No. 5517), an interlocutory decree is to be entered overruling the demurrer to the bill of complaint; and a final decree is to be entered declaring that the dealers policies in controversy may not be written under G. L. (Ter. Ed.) c. 175, § 47, Second.

*So ordered.*